1  GAIL HARPER, State Bar #104510
   Attorney at Law
2  P. O. Box 330057
   San Francisco, CA 94133
3  Telephone:    (415) 291-8469
   Facsimile:    (415) 433-2230
4  E-Mail:       crimlaw5@gmail.com

5  In Pro Per

6                    UNITED STATES DISTRICT COURT

7                   NORTHERN DISTRICT OF CALIFORNIA

8  GAIL HARPER,                        No. C 11-01306 JW

9
                                       **PLAINTIFF'S MOTION TO**
10            Plaintiff,               **RECUSE JUDGE WARE**

11    v.

12                                      Date of Removal:     March 18, 2011
   RYAN LUGBAUER; W.B. COYLE; DAVID     Date Action Filed:   November 18,
13 KENNEDY; LARRY PAGE; MARCIA CLAY;                         2010
   CHAD ERTOLA; GEORGE GASCON, an
14 individual and as an Agent of the SAN  Trial Date:        None Set
   FRANCISCO POLICE DEPARTMENT;
15 ANNA BROWN, an individual and as an Agent of
   the SAN FRANCISCO POLICE DEPARTMENT;
16 CARL TENNENBAUM a.k.a. CARL TEE or
   CARL T, an individual and as an Agent of the
17 SAN FRANCISCO POLICE DEPARTMENT;
   THE SAN FRANCISCO POLICE DEPARTMENT
18 and THE CITY AND COUNTY OF SAN
   FRANCISCO, a MunicipalCorporation, and
19 DOES 1-100, inclusive,
20
   Defendants.
21

22

23

24

25

26         Plaintiff   Gail   Harper,   upon   the   attached   memorandum   of   points   and   authorities,

27 declaration, exhibits and certificate of good faith, respectfully moves that the Hon. James Ware

28

   **Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE      Page 1**

1    recuse himself from the above-referenced action.

2

3    DATED: February 26, 2012                     Respectfully submitted,

4

5                                                 _____//_____//_____

6                                                 GAIL HARPER, In Pro Per

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. BACKGROUND AND PROCEDURAL HISTORY

In this case, Plaintiff has raised a 42 U.S.C. § 1983 claim against the City and County of San Francisco and individual police defendants. Plaintiff has also raised various state law claims arising out of an ongoing, continuous course of conduct by a group of neighborhood men and individual police officers that violates Plaintiff's civil right to be free of gender violence and the threat of gender violence.   Plaintiff has also raised claims of conspiracy to commit battery [rape], and defamation.

Plaintiff originally filed suit in the San Francisco Superior Court on November 18, 2010. On February 14, 2011, Plaintiff filed a First Amended Complaint in San Francisco Superior Court, naming a new defendant.   On March 18, 2011, defendant City and County of San Francisco removed the case to the federal district court.  (Docket No. 1.)  During the past year several defendants have made multiple motions to dismiss Plaintiff's complaints against them. (Docket Nos. 11, 19, 22, 29, 67, 71, 83, 84, 94.)  The current such motion – an Anti-SLAPP motion by the individual police defendants – is set for hearing on March 5, 2012, having been moved up from the originally scheduled hearing date of March 12.  (Docket No. 98.)

The individual defendants are primarily men in Plaintiff's neighborhood to whom Plaintiff said "no."   Years ago, and without Plaintiff's knowledge, these men viciously set about to ruin Plaintiff's reputation and life by falsely characterizing her as a "slut" and a "crazy" person who deserves no credibility as a human being and no right to live her life as she chooses because she is female.   By their defamatory and hateful talk naming Plaintiff as a "slut" or as being sexually "easy," defendants – knowing Plaintiff was celibate and would not consent to sex with them or any of their friends – set Plaintiff up to be raped by betting among themselves as to which of them would "score" sex with Plaintiff first once her son left for college.   Defendant RYAN LUGBAUER took up the challenge, and in December of 2005 he raped Plaintiff after Plaintiff repeatedly and clearly told him that she was not interested in having sex with him or anyone else.  Since then, with the encouragement and aid of the other defendants, defendant

1  RYAN LUGBAUER has stalked and harassed Plaintiff and made every effort to destroy
2  Plaintiff's life, including uttering threats to destroy Plaintiff's ability to make her living as a
3  lawyer by having Plaintiff disbarred, and to send Plaintiff to jail on trumped-up criminal charges.
4  The individual police defendants have conspired with and aided and abetted defendant RYAN
5  LUGBAUER by encouraging his stalking and harassment of Plaintiff.   Once Plaintiff obtained
6  a temporary restraining order against defendant RYAN LUGBAUER, the individual police
7  defendants obstructed justice by deliberately and corruptly interfering with Plaintiff's access to
8  police services and the courts and refusing to enforce Plaintiff's temporary restraining order
9  when defendant RYAN LUGBAUER violated it.   Because defendant RYAN LUGBAUER has
10 been emboldened by the conduct and attitude of the police  –  and now of Judge James Ware –
11 LUGBAUER continues to violate Plaintiff's right to be left alone by – among other things –
12 directing insulting comments at her when she is within his range.

13     Plaintiff is being punished by the defendants for living her life as though she were a free
14 and equal citizen of the United States of America, for choosing not to marry or to place herself
15 under the control of a boyfriend or other male, for being alone in public places, for saying "no"
16 to sexual or "romantic" advances, and for attempting to access the services of the San Francisco
17 Police Department and the courts for her protection against men who have sexually assaulted
18 or battered her, damaged her property, or otherwise stalked and/or harassed her.

19                **II. LEGAL STANDARDS FOR RECUSAL**

20     Litigants are entitled to a judge who is detached, fair and impartial.  *Shad v. Dean*
21 *Witter Reynolds, Inc.*, 799 F.2d 525, 531 (9th Cir.1986).

22     Two federal statutes provide for the recusal of district court judges.  The first, 28
23 U.S.C. § 155, states that

24     Whenever a party to any proceeding in a district court makes and files a timely and
       sufficient affidavit that the judge before whom the matter is pending has a personal
25     bias or prejudice either against him or in favor of any adverse party, such judge shall
       proceed no further therein, but another judge shall be assigned to hear such
26     proceeding.  The affidavit shall state the facts and the reasons for the belief that bias
       or prejudice exists, and shall be filed not less than ten days before the beginning of
27     the term at which the proceeding is to be heard, or good cause shall be shown for
28

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE     Page 4**

1    failure to file it within such time.   A party may file only one such affidavit in any
2    case.   It shall be accompanied by a certificate of counsel of record stating that it is
     made in good faith.
3    *Id.*

4    To sustain disqualification under §144, *supra*, there must be demonstrated bias and
5    prejudice of the judge arising from an "extrajudicial source" which renders his trial
6    participation unfair in that it results in an opinion formed by the judge on the merits on
7    some basis other than that learned from his participation in the case. *United States v.*
8    *Grinnell Corporation*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Davis v.*
9    *Cities Service Oil Company*, 420 F.2d 1278 (10th Cir. 1970).

10   Section 455, in contrast, imposes a self-regulating duty on a judge to "disqualify
11   himself in any proceeding in which his impartiality might reasonably be questioned," and,
12   in relevant part, "[w]here he has a personal bias or prejudice concerning a party ...." 28
13   U.S.C. § 455(a).   Bias or prejudice sufficient to trigger recusal may be based on
14   "extrajudicial sources" distinct from the litigation, or, in rare cases and as alleged here,
15   "pervasive bias" arising from the course of the instant litigation, where the bias is "so
16   extreme as to display clear inability to render fair judgment." *Liteky v. U.S.*, 510 U.S. 540,
17   551 (1994); *see also Peacock v. Checker Records, Inc.*, 430 F.2d 85, 89 (7th Cir. 1970)
18   (reversing district court's denial of recusal motion based on district court's stated
19   intention to take action inconsistent with the mandate of the court of appeals).

20   In assessing the motion, the Court must ask "whether a reasonable person [would]
21   perceive[] a significant risk that the judge will resolve the case on a basis other than the
22   merits." *Clemens v. U.S. Dist. Ct. for the Central Dist. of California*, 428 F.3d 1175,
23   1178 (9th Cir. 2005) (internal citation and quotations omitted).   Under either statute,
24   recusal should be granted where "a reasonable person with knowledge of all the facts would
25   conclude that the judge's impartiality might reasonably be questioned." *Yagman v.*
26   *Republic Ins.*, 987 F.2d 622, (9th Cir. 1993); *see also King v. U.S. Dist. Ct.*, 16 F.3d 992
27   (9th Cir. 1994) (Reinhardt, J., concurring) ("We must look to how the judge's conduct
28   appears to the public; in other words we must consider the appearance of justice.").

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE      Page 5**

1    This Court has demonstrated an inability and unwillingness to understand Plaintiff's

2    perspective and experience as a woman, resulting in this Court's open expressions of

3    personal disbelief of Plaintiff's allegations.   In *Ellison v. Brady*, 924 F.2d 872 (9th Cir.

4    1991), the Ninth Circuit held that the existence of harassment should be analyzed from the

5    perspective of the victim.   *Id.* at p. 878 [courts "should consider the victim's perspective

6    and not stereotyped notions of acceptable behavior." If we only examined whether a

7    reasonable person would engage in allegedly harassing conduct, we would run the risk of

8    reinforcing the prevailing level of discrimination.   Harassers could continue to harass

9    merely because a particular discriminatory practice was common, and victims of

10    harassment would have no remedy.].   In so doing, the *Ellison* Court recognized that those

11    who suffer from bias may have a different view from those who do not.

12    By acknowledging and not trivializing the effects of gender bias on reasonable

13    women and men, courts can work toward ensuring that neither men nor women will have

14    to run a gauntlet of abuse in return for the privilege of being allowed to work and make a

15    living – let alone simply existing in the world.   See Ehrenreich, *Pluralist Myths and*

16    *Powerless Men: The Ideology of Reasonableness in Sexual Harassment Law*, 99 Yale

17    L.J. 1177, 1207–1208 (1990) [men tend to view some forms of sexual harassment as

18    "harmless social interactions to which only overly-sensitive women would object"];

19    Abrams, Gender Discrimination and the Transformation of Workplace Norms, 42

20    Vand.L.Rev. 1183, 1203 (1989) [the characteristically male view depicts sexual

21    harassment as comparatively harmless amusement].

22    Gender bias must not be countenanced in any case, but if there is any type of

23    proceeding that might call for more rigorous review it is precisely the type of case at bar,

24    because judicial gender bias appears most likely to arise in litigation in which gender is

25    material.   A study of gender bias in the federal judiciary found that "[i]n sexual harassment

26    or discrimination cases before a male judge, plaintiffs' lawyers report a minimization of

27    their clients' trauma and 'an across the board lack of understanding' as to the female

28    plaintiff's situation and point of view." (Ninth Circuit Gender Bias Task Force, The Effects

1  of Gender in the Federal Courts: The Final Report of the Ninth Circuit Gender Bias Task

2  Force (July 1993) [hereafter "Report of the Ninth Circuit Gender Bias Task Force"] at p.

3  127.) (The complete Report of the Ninth Circuit Gender Bias Task Force, together with

4  appendices, is set forth in 67 So.Cal.L.Rev. 745, at pp. 745–1106 (1993).)  Thus, for

5  example, the Report of the Ninth Circuit Gender Bias Task Force found that "[t]he

6  approach to sexual harassment cases taken by the district courts often reflects both a

7  restrictive application of the law to sex discrimination cases in general and an impatience

8  with these cases. (*Id.* at p. 126.) This report goes on to describe the view of participants

9  in its study that "paternalistic" male judges are excessively impatient in sexual harassment

10  and discrimination cases, because they see these matters as " 'small stakes' cases." (*Id.* at

11  p. 127, fns. omitted.) Participants in the Ninth Circuit study also noted that judicial

12  impatience "works to the disadvantage of . . . female . . . plaintiffs because a discrimination

13  case often requires time to educate the judge or the jury, 'so you have to figure out a way

14  to get the evidence in front of the judge before he knocks you off at the knees.' " (*Id.* at p.

15  128.)

16  ### III.  RECUSAL IS WARRANTED

17       Here, as set forth in the attached declaration of Plaintiff – and is manifestly clear

18  from the attached transcripts of the hearings on September 19, 2011 and February 6, 2012,

19  also attached hereto –  there are clear indications of Judge Ware's past bias in this case,

20  and his further actions with respect to Plaintiff during the February 6, 2012, hearing

21  demonstrates sufficient bias to warrant a transfer.

22       An objective observer would reasonably question the Court's impartiality, as the

23  Court has repeatedly engaged in personal attacks on plaintiff – who is a lawyer proceeding

24  *in pro per* –  using snide, sarcastic tones and permitting the male defendants and defense

25  counsel to laugh at Plaintiff in open court; has ignored Plaintiff's request to admonish

26  counsel for defendant LARRY PAGE for his gender-biased obstructionist conduct toward

27

28

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE     Page 7**

1  Plaintiff, despite the mandates of Local Rules 11-4(b)[1] and 11-6; has issued rulings that
2  would irreparably harm Plaintiff; has *sua sponte* considered issues not raised by the
3  defense that will prejudice Plaintiff and; has encouraged the defendants to file more
4  dispositive motions; and has subjected Plaintiff to procedures, demands and threats that
5  exceed Judge Ware's powers and authority as a judge, that are intended to embarrass,
6  humiliate and block Plaintiff from fully litigating this case.

7  ## CONCLUSION

8  For the foregoing reasons,  and those set forth in the attached declaration, Plaintiff
9  respectfully moves that the Hon. James Ware be recused from this action and the matter
10  transferred to another district judge.

11
12  Dated: February 25, 2012

13  _____
14  GAIL HARPER
      In Pro Per
15
16
17
18
19
20
21
22
23
24
25  _____
26  [1]
27  Local Rule 11-4(b) provides: "The practice of law before this Court must be free from prejudice
    and bias. Treatment free of bias must be accorded all other attorneys, litigants, judicial officers,
28  jurors and support personnel. Any violation of this policy should be brought to the attention of
    the Clerk or any Judge for action under Civ. L.R. 11-6.

# DECLARATION OF GAIL HARPER

I, Gail Harper, hereby declare:

The facts stated in this declaration are based upon my personal knowledge and if called to testify I could and would do so competently as follows:

1.   I am representing myself in this lawsuit seeking damages and injunctive relief via a 42 U.S.C. § 1983 claim against the City and County of San Francisco and police defendants.   I am also seeking damages against the individual defendants for various state law claims arising out of an ongoing, continuous course of conduct by a group of neighbors and individual police officers that violates my civil right to be free of gender violence and the threat of gender violence, and claims for conspiracy to commit battery [rape], and defamation.

2.   I have practiced law for approximately thirty years. This is the first time in my career I have asked a trial court or an appellate court to transfer a case to another judge.

3.   There is good cause for this motion having been brought this date rather than earlier in the proceedings.   While there has been a pattern of actions that were demeaning and belittling to me as set forth below, it was only after the February 6, 2012, hearing that the overwhelming bias of this Court toward me – and the likely impact on the fairness of any further proceedings heard before this Court – was crystallized.

4.   This Court has repeatedly been sarcastic, dismissive and demeaning toward me during personal appearances, and has permitted the defendants and the defense attorneys – all of whom are male – to laugh at and jeer at me in open court, all the while assuming a protective stance toward the defendants.

5.   For example, I originally filed suit in San Francisco Superior Court, using the pseudonym JANE DOE in order to protect my privacy as a rape victim and to avoid exposure to a larger audience of the sexually graphic details of the defamation and the violence to which I have been subjected by the defendants.   After the City and

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE       Page 1**

County of San Francisco removed this case to the federal district court, defendant LARRY PAGE –  in an effort to embarrass me and to deter me from proceeding with this lawsuit –  moved to dismiss for lack of jurisdiction because I had not used my real name in the case caption as the plaintiff.  I then moved for a protective order to permit me to continue to litigate the case under the pseudonym.  (Docket No. 42.)  My motion for a protective order was set to be heard on October 24, 2011.  Because California has a strong policy of protecting the privacy of rape victims, I have no doubt that had the case remained in state court I would have been permitted to continue to litigate the matter as a JANE DOE.  Instead of hearing my motion for a protective order on the date set, this Court ambushed me by bringing up that motion at the September 19, 2011, hearing on the Dunns' Anti-SLAPP motion, when I was unprepared to address it.  (See Exhibit A, reporter's transcript of September 19, 2011 proceedings, p. 4.)  This Court argued with me about appearing *pro per* while using my real name as counsel of record.  (Exhibit A, pp. 5-14.)  I was taken aback, as I sincerely believed I would be permitted to remain anonymous as the plaintiff because the overwhelming weight of authority within the Ninth Circuit permits rape victims to remain anonymous in civil cases.  After this Court detailed the logistical difficulties the Court perceived in allowing me to proceed anonymously, the following exchange took place:

> THE COURT: Well, I think it's, quite frankly, at bottom, *inconsistent to make the kinds charges you are making* and seek the kind of protection you are asking the Court to give.

> MS. HARPER: Well, if I weren't representing myself --

> THE COURT: You are –  *you chose to use this forum*, you are welcome to use this forum, but I will not grant you permission to hide behind the pseudonym because the Court finds no compelling reason to do so.  *Nor will I, as a matter going forward, impose any protective order that allows you and deprives the defendants of the right to have the parties address the facts and the individuals as they are.*

1      MS. HARPER: May I ask a question?

2      THE COURT: Certainly.

3

4      MS. HARPER: Is the distinction that it's because I'm representing myself; if I had a lawyer you would allow me to pursue

5 [sic] as a Jane Doe?

6      THE COURT: No, it's not just that, but if a lawyer came in,

7 and lawyers do, I have cases that are under seal, the name of neither the plaintiffs nor the defendants are revealed by the litigation

8 because there is compelling reasons to do so, *I don't find any*

9 *compelling reason to keep your identity secret. You are making charges against these defendants, not someone else*, *and so it's*

10 *because of the nature of the litigation* and the lack of any compelling showing that I'm making my ruling. . . .[2]

11

12 (Exhibit A, pp. 12-13.)   In fact, I did not choose this forum – the City and County

13 of San Francisco chose it by removing the case to federal court.

14   **6.**  Also during the September 19, 2011, proceedings – although the court reporter did

15 not note the incident – several of the men sitting behind me at defense counsel's

16 table burst out laughing at me, and this Court did nothing to stop them or to

17 admonish them in order to maintain control over the courtroom.   I can only

18 conclude that this Court's tolerance of counsel's unprofessional behavior – which

19 would not otherwise be tolerated in the judicial halls of the United States District

20 Courts – is evidence of this Court's attitude toward me.

21   **7.**  During the same hearing, when I asked this Court whether it would make a

22 difference if I had counsel, this Court stated sarcastically, "No –  you didn't quote

23 me, did you?" and then remarked insultingly, "*You are not doing a very good job,*

24 *but your lawyer might. So I don't know.*" (Exhibit A, pp. 13-14.)  I tried to explain

25 to this Court that it is extremely difficult for a woman to bring a lawsuit such as

26

---

[2]

27 The meaning of this Court's vague references to the "nature of the litigation against these

28 defendants" did not become clear until the February 6, 2012, hearing, during which this Court's personal animosity toward me was articulated more clearly, as described below.

1    this one –  and why that might be the reason there are so few reported cases

2    involving rapes or sexual bullying brought under California's civil rights statutes.

3    As I attempted to explain my own fear of having the defendants' grotesque and false

4    sexual fantasies that they claim to be "facts" about me exposed to the entire world

5    – a world where people are more inclined to believe men, not women – and that I

6    could not afford counsel, this Court impatiently ordered that my identity as

7    plaintiff be made public immediately.  (Exhibit A, p. 14.)

8    **8.**    Later during the September 19, 2011, proceedings, as I tried to explain the harm

9    done to me by the Dunns (the defendants who had brought the Anti-SLAPP motion

10   being heard that day) this Court made the following belittling and condescending

11   comments:

12       THE COURT: *I want to listen patiently to you  because I am disposed to*

13   *dismiss the claim.* And it's important to the Court to understand the claim

    because it seems to me that if there is a way to amend it to get around

14   these matters, I want to allow that.

15           If parties come to a court of law seeking remedies for some civil

16   wrong that's been made again them, the Court ought to be open for that and

    allow those claims to be heard on the merits. *And that's why I'm listening*

17   *hard.*

18           *I've read through the materials -- it's very rambling -- but I've*

19   *read through the materials. And so this  is your opportunity to speak;*

    *I'll give you a few more moments  before I bring the matter to a close.*

20

21   (Exhibit A, pp. 21-22.)    This was my first hearing before this Court, and I was

22   rattled by this Court's refusal to allow me to proceed anonymously.    There was no

23   need, however, for this Court to address me as though I were a child or an insane

24   person.    (This may have been the point where the men at counsel's table laughed

25   at me, since their position is that I have not been wronged, that I am a "slut," and

26   that I am simply "paranoid" and "crazy.")  This Court's patronizing display in saying

27   "I want to listen patiently to you" and of calling my complaint "rambling" was

28   inappropriate.   My complaint is detailed, and has become more detailed since the

defendants have brought their motions to dismiss for failure to state a claim, but it is not "rambling." "Rambling" is code for "crazy" when it is used to describe something a woman has said or written. This Court's use of the word "rambling" was a direct insult and was a way of cozying up to the defendants and their counsel and assuring them that they have nothing to fear from this Court, as I have been placed at a serious disadvantage in these proceedings by this Court's own gender bias.

9. The September 19, 2011, hearing on the Dunn's Anti-SLAPP motion concluded with the following exchange:

> MS. HARPER:. . . So [the Dunns and the other defendants] are making me out to be a liar. And apparently you don't find me very credible, either, and I'm very sorry that that's the case. But these are defamatory statements. They weren't protected by the litigation privilege. They are not -- you know, they don't fall within the SLAPP Statute, Anti-SLAPP Statute. And --
>
> THE COURT: I don't know what makes you say apparently I don't find you very credible.
>
> MS. HARPER: I'm feeling defensive.
>
> THE COURT: That's again another -- *I'm going to cut off because you are actually doing yourself more harm than good at this point.* Let me rely on your papers.

(Exhibit A, p. 24.)

10. My feelings of apprehension and defensiveness were justified, because at the February 6, 2012, hearing on yet another volley of motions to dismiss, this Court went into a full, unjustified, negative attack on my character.

11. As indicated in the transcript of the third hearing in this case on February 6, 2012, this Court appeared to rule on defendants W.B. COYLE's and LARRY PAGE's motions to dismiss out of personal animosity toward me, rather than as a result of the deliberative process based on the facts as alleged in the complaint, the law governing adequacy of pleadings, and the rules and procedures to be followed in

1
2
3
4
5

hearing and ruling upon Rule 12(b) motions.    There has been no discovery in this case, since it has been hung up for the past year with serial motions to dismiss. There is no basis for a motion for summary judgment at this stage.   There is also no legitimate reason for this Court to treat my claims with the incredulity the Court has expressed.

6
7
8
9
10
11
12
13
14
15

**12.**    The February 6, 2012, hearing began with this Court interrogating me as to whether – regarding the conspiracy and claim – I had adequately pleaded an agreement to commit rape, and specifically whether pleading that men were "betting" on "scoring" sexually with me, knowing that I would not consent to having sex with any of them, was sufficient.   (See Exhibit B, transcript of the proceedings February 6, 2012, pp. 4-6.)    The hearing on whether, under Rule 12(b), a conspiracy was adequately alleged on the face of the pleading quickly morphed into a combative, partisan, *sua sponte* cross-examination by this Court on whether my allegations were made in "good faith" – even though no party had made a Rule 11 motion or in any other way raised the issue of good faith:

16
17
18
19
20
21
22
23
24
25
26
27
28

        THE COURT: Do you have any legal authority –

        MS. HARPER: I haven't got any case cites for that, but I know that women have a Constitutional right to their physical integrity just as men do. And that if you have a group of men getting together and seeking to violate a woman's physical integrity – these guys know me well enough to know that I'm not promiscuous, that I didn't want to have sex with anybody, and their very statement that the bet was – I'm sorry.

        THE COURT: I'm sorry. How would they know that you did not want to have sex with anyone?

        MS. HARPER: With anybody? Because I've been telling people for years that I'm celibate. I've been celibate for 12 years.

        THE COURT: You've had conversations with Mr. Coyle –

        MS. HARPER: Not with them in particular. I was avoiding them. These guys -- why are they talking about me in the first

1    place?

2         THE COURT: No. The question that I was asking is, you've
3    said as a matter of fact that they did not know, or – they did they
4    know that you were someone who did not wish to have sex; that
     you were celibate. *And so that becomes a question for the Court as*
5    *to how they would know. Now, you could tell them, or they could be*
6    *told by someone else. So how would they know?*[3]

7         MS. HARPER: I informed them and believe that other people
     told them, and I told them --
8
9         THE COURT: What is that information? Did someone tell
10   you that they were told?

11        MS. HARPER: I didn't know that this talk was going on. See,
     that's the problem with this.
12
13        THE COURT: That was a "yes" or "no" question. Did
     someone tell you –
14
15        MS. HARPER: No. Nobody told me that they were --

16        THE COURT: *What is your information?*

17        MS. HARPER: My information is North Beach is a very
18   small community, and these guys have been watching me like
     hawks for years. They've been angry at me for years, and they
19   wanted to punish. This wasn't, you know, just sitting around talking
20   sports.

21        THE COURT: *What is your information -- you make these*
22   *statements. This is a court of law* –

23        MS. HARPER: Correct.

24

25   _____
     [3]
26

27   Here this Court demanded –  contrary to law and Rule 12(b) procedure –  that I provide *direct*
     *evidence* of an agreement to commit an illegal act in order to *plead* conspiracy.  It is well-
28   settled that direct evidence is not required to *prove* a conspiracy, let alone plead one, so this
     entire line of questioning was both irrelevant and abusive.

1
2

THE COURT: – and I have to assume the allegations in your complaint are true for purposes of these proceedings.

3

MS. HARPER: That's true.

4
5
6

THE COURT: *You are now making statements beyond what you've alleged, and so that's why I'm being very cautious here, because quite frankly, after reading the papers my intent was to dismiss your complaint.*

7
8

So this is your opportunity to raise for me the prospect that there is something that you could allege that you haven't alleged.

9
10
11

And so when you make a statement that's not in your pleading, that means if I give you another opportunity perhaps you could put that in your pleadings –

12

MS. HARPER: I'm entitled to –

13
14

THE COURT: – but *I'm not going to give you that opportunity unless I'm satisfied that it's on a good-faith basis.*[4]

15
16
17
18

If you tell me that you have information that these two defendants knew that you were a celibate person, not that that would be sufficient, but that's a fact, and it seems to me that if you make that statement, you must have a basis for it. Or it could be that you are making a statement without any basis. It's just your speculation.

19
20
21
22

MS. HARPER: You know, I think we get into a cultural problem here in that you may not be aware of the effect that gossip has on women, and how men come together in groups secretly, which is part of the reason why conspiracies are allowed to be alleged based on information and belief.

23
24
25
26

Because if you look at the law of conspiracy that I cited you don't even need to –  they don't have to sit down at a table and say, "Hey, let's agree to – somebody should go get her and screw her without her permission." They don't  have to sit down and do that. They don't even all have to know each other.

27
28

_____

[4]Here this Court *sua sponte* turned a Rule 12(b) hearing into a Rule 11 proceeding.

1
2
3
4

It's this crowd, this mob, this whispering campaign, this sexualizing, you know, the encouraging each other to go after a particular woman who has infuriated them  because she doesn't respect them, she doesn't want to have sex with them, she's rejected specific propositions by Mr. Kennedy and Mr. Page.

5
6
7
8

You look at the circumstances. Why on earth is Mr. Page still enraged at me after I told him in 2001 to stop calling me? That's all I did. That guy's been in a rage ever since.  He used to sit there at the bar at Moose's. I'd see him about every third time I went in there. I used to go in there several times a week. He would be in there drinking, and he kept an eye on me.

9
10
11
12

Now, I wasn't in there picking up men. My behavior was conservative.  I was having dinner at the bar. And this guy –  he would try to talk to me, and I would just ignore him, because I don't want to encourage the man.

13
14

And it's a subterranean thing that you may not have heard much of in your courtroom about these kinds of behaviors. But I think you have to start with the fact that  –

15
16
17

THE COURT: You do allege that Defendant Page "has continuously expressed his rage."  Tell me in what way he, one, expressed his rage, and then how he did that continuously.  So what is it that he did to express his rage?

18
19
20

MS. HARPER: He spoke on the telephone to another former Postal worker who lives in Tennessee, and has continued to speak to him on the phone.

21

THE COURT: What is your definition of "rage"?

22
23

MS. HARPER: Of rage?

24

THE COURT: Yes.

25

MS. HARPER: Irrational anger.

26
27

THE COURT: And so this was an irrationally angry telephone conversation that he had?

28

MS. HARPER: No. Just the fact that he's even talking or

1    thinking about me after, you know, it's, what – how many years is it?
2    It's 2012 now, and in 2001 I very politely asked him not to call me and
3    not to walk by my apartment.

4        Why is this man who has never had a relationship with me still
5    engaged in this anger? And my friend who is still in Tennessee said he
6    is angry.  He was going on and on about his dealings with me. This man
     had no dealings with me –

7        THE COURT: Maybe you've hit on somebody here. In other
8    words, you have a friend in Tennessee –

9        MS. HARPER: I have a witness.

10       THE COURT:   who had a telephone conversation with Mr.
11   Page –

12       MS.  HARPER:  Multiple  telephone  conversations.  They  talk
13   frequently.

14       THE COURT: What's that name of the friend?

15       MS. HARPER: Oh, what's his name? I'm going to blank out,
16   'cause I'm tense. Robert Hijar.

17       THE COURT: Robert –

18       MS. HARPER: H-I-J-A-R, Robert.

19
20       THE COURT: All right. And you've had multiple conversations
21   with Mr. Hijar?

22       MS. HARPER: What happened was I was exchanging e-mails
23   with him in 2001, and I have the e-mails, and – I'm trying to remember
     exactly what he said.

24       He asked me to convey a message to Mr. Page, and I said, "I
25   don't think Mr. Page is friendly toward me anymore" –

26       THE  COURT:  *You  are  asking  your  own  questions  and
27   answer. I'm trying to inquire – really, as I indicated, trying to see
28   whether there's a basis here.*

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE     Page 10**

1        So you'd had conversations with Mr. Hijar –

2        MS. HARPER: They were e-mails.

3

4        THE COURT: –  e-mails –

5        MS. HARPER: And then I lost touch with him.

6        THE COURT: –   over a series from 2001.  Your allegation is

7    continuously.

8        MS. HARPER: Right.

9        THE COURT: So between September 2001 and the present

10   time you've had a series of e-mail conversations with Mr. Hijar, and

11   you say you have them here.

12        MS. HARPER: No, I don't have them with me, but I possess

13   them.

14        THE COURT: All right. And so –

15        MS. HARPER: And most recently when I found out –

16        THE COURT: Excuse me.

17

18        MS. HARPER: I'm sorry.

19 (Exhibit B, pp. 5-11.)

20 **13.**    At this point, the proceedings began to take on a more insulting, threatening,

21      overreaching and intimidating tone, as this Court made it clear to me and to

22      everyone else in the courtroom that this Court personally believes I am

23      "misrepresenting" and "exaggerating" the facts – in other words – that I am lying

24      about what the defendants have done to me:

25        THE COURT: And so you can supply to the Court, then, this

26    series of e-mails between September 2001 and the present time

27    between you and Mr. Hijar, where he indicates that Mr. Page is
    angry?

28        MS. HARPER: Right.

1    THE COURT: How many are there approximately?

2    MS. HARPER: Maybe a dozen.

3

4    THE COURT: And in this series of e-mails Mr. Hijar
     apparently is in communication with Mr. Page and is passing on his
5    conversations with Mr. Page?

6    MS. HARPER: Correct.

7    THE COURT: And the anger is over what?

8

9    MS. HARPER: Because I asked Mr. Page not to call me.  He's
     a Postal worker.  He obtained my telephone number and my
10   residential address from the Postal records, and he started calling me
     up.  And the first call was supposedly about a package, but that was a
11   pretext.  And then there were a couple  more calls where he wanted
12   to talk to me just personally. And  –

13   THE COURT: *I'm tempted to have you sworn at this point,*
14   *since I want to make sure you understand that your whole case can*
     *be thrown out if you are misleading the Court about this series of*
15   *events.*[5]

16

17   *Because the next step would be for the Court to ask you to*
     *supply it with a series of e-mails, and to allow the Court to contact*
18   *Mr. Hijar to verify* that over this period of time, which is 2001 to the
     present, which is a 10-year or more period of time there's been a
19   series of conversations between him and the defendant where the
20   defendant has expressed anger over this 2001 event and/or series of
     events that has left – that qualify as rage on the part of the defendant,

21

22

23       [5]     _____

24   I reasonably took this statement as a threat to subject me not only to the extreme sanction of
     dismissal of my entire case, but also as a thinly veiled threat to report me to the State Bar of
25   California or other authorities for perjury if this Court should disagree with my honest
     articulation of the facts.  In other words, at this point this Court was threatening me in the same
26   manner that some of the defendants have threatened me – to deprive me of my ability to make
     a living as a lawyer if I do not stop complaining about being defamed, raped, stalked and
27   harassed, and if I continue to state my case in the forthright and honest manner that this Court
28   has no legitimate reason to doubt.

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE      Page 12**

1    and that has caused him to take certain actions against you.[6]

2            Now, I'm following that as the serious allegation you are
3    making to the Court.

4            Have I said anything that is mistaken?

5
6            MS. HARPER: I want to clarify that there was a series of
     e-mails –

7            THE COURT: Let's do it this way. Swear the –
8
9            MS. HARPER: This feels like a motion for summary
     judgment.
10
11           THE COURT: Well, you've brought this in as a reason for me
     to allow your case to continue, and if it's not – I would dismiss this
12   complaint subject to your verifying this information in a new
     complaint. That's why I'm having you sworn.
13
14           *Because if you can't swear to this and if you can't produce
     it, it has serious implications for your case altogether, because*
15   *you shouldn't mislead the Court by exaggerating in court, telling*
     *me about things that happened.*
16

17           Swear the plaintiff.

18           THE CLERK: Please raise your right hand.
19
20           MS. HARPER: (Complies.)

21           THE CLERK: Do you solemnly swear or affirm that the
22   testimony you are about to give in the matter now pending before this

23   ─────────────────────────

24   [6]

25   I believe that a reasonable person would find it outrageous that a federal judge would – during
     a Rule 12(b) hearing – spontaneously create a special procedure by which he renders himself
26   an investigator for the defense, demanding evidence from the plaintiff so that he can contact her
     witnesses to "verify" that she is telling the truth, or else he will subject her to the sanction of
27   dismissal of her case.   There is no heightened pleading requirement for a claim of conspiracy
     to commit a rape – see Rule 9(b) – and this Court has no reason to believe that I am
28   misrepresenting, exaggerating or lying about my claims.

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE     Page 13**

1    Court is the whole truth?

2           MS. HARPER: Yes, it is.

3
4           THE COURT: All right. So, everything you've just told me you
     swear is true?

5
6           MS. HARPER: Yes, and I want to qualify – I want to clarify
     something.

7
           THE COURT: Yes.

8
9           MS. HARPER: That there was a series of e-mails in 2001
     where Mr. Hijar – I think that's how you say it – asked me to tell
10   something to Larry Page, and I said, "I don't think that Mr. Page is
     friendly toward me. I don't think he wants to talk to me."
11

12          And then I told him about what had happened, that Mr. Page
     was angry because I had asked him not to call me and not to walk by
13   my apartment.

14
           I'm a very private person, and I'm a criminal defense lawyer,
15   and I don't like people knowing where I live, and I don't like men
     encroaching on me where there's no relationship.
16

17          So I told Mr. Page to back off, and I told Mr. Hijar about this.
     Then Hijar lost track of me, but we stopped e-mailing between I think
18   it was the beginning of 2002 or late 2001 until I found out in 2009,
     I believe it was – is that right? Or 2010 – sometime within the last
19   year or so that Mr. Page had made statements to Ryan Lugbauer, the
     rapist, that I had falsely accused him of sexual harassment.
20

21          So I obtained Mr. Hijar's current e-mail address, and I
22   e-mailed him, and I said, "Have you been talking to Mr. Page?"
     Because I was really surprised, because I didn't think anybody – I
23   didn't think Mr. Page would still be talking about me after all these
     years.
24

25          Mr. Hijar wrote back and he said, "Yes. We talk on the phone
26   frequently, and he has talked about his dealings with you."

27
           And again, I was very surprised because I've the had no
28   dealings with him. I've avoided him. If he says "hello" to me I say

           Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE     Page 14

1   "hello," but I walk by. So there haven't been any conversations. There's

2   been nothing.

3         Now, to me –

4         THE COURT: Let me stop you, because you've modified your

5   statement somewhat. And so it hasn't been a series between 2001 and

6   the present time; it was a series in 2001.

7         How many took place at that time? How many e-mail

8   exchanges?

9         MS. HARPER: Maybe as many as a dozen; maybe as few as

10  six. They are all on the list.

11  THE COURT: I thought the total was a dozen you told me, but –

12        MS. HARPER: Well, I'm not sure. I don't have them in front

13  of me. I can't count them. I'm sorry.

14        THE COURT: I understand –

15        MS. HARPER: I'm trying to be as accurate as I can, and I didn't

16  want you to think that it was continuous over 2001 to the present –

17        THE COURT: That's the allegation.

18        MS. HARPER: No, no.

19
20        THE COURT: "Continuously expressed his rage for being

21  rejected" –

22        MS. HARPER: Well, not just to Robert. I'm saying the e-mails

23  between myself and Robert are evidence of this rage.

24        This is why we need discovery. We need to find out who he

25  was talking to and when the conversations took place.

26        THE COURT: No. You are making the allegation.

27        MS. HARPER: No. I understand that.

28        THE COURT: I'm trying to find out what you have –

1      MS. HARPER: Right.

2      THE COURT: – *and whether you have sufficient material to*
3   *justify the allegations you are making against these individuals.*

4      MS. HARPER: Correct.

5      THE COURT: *Because they are entitled -- just as you are*
6   *entitled to relief if you are alleging a claim, they are entitled to*
7   *walk out of here and not have a claim made against them if there's*
    *no basis. It's just as wrong for you to be  denied a claim that you*
8   *have as for them to be involved in a case for which there is no*
9   *evidence upon which you would base the allegation.*[7]

10      You would agree with that, wouldn't you?

11      MS. HARPER: Yeah. I understand that.

12
13      THE COURT: It works both ways.

14      MS. HARPER: And –

15      THE COURT: Now let me finish. You are about to interrupt
16   me again.

17      Do I understand that then there was a hiatus between your
18   contact with Mr. Hijar between 2001 and some other period of time?

19      When did you resume your communication?

20
21      MS. HARPER: I think it was 2010, but I'm not sure.   It might

22   _____
    [7]

23   This Court here indicates confusion between Rule 12(b) standards and Rule 56 summary
24   judgment standards.  Evidence should not have been an issue at this proceeding, unless I was
    given notice and the opportunity to provide a Rule 56(e) declaration documenting the discovery
25   I believe I need to establish my claims against LARRY PAGE and W.B. COYLE.  If the concern
    was evidence, then this Court should have allowed me to proceed with discovery, and the
26   defendants could at an appropriate time move for summary judgment if the evidence did not
27   support my claims.   Instead of doing that, this Court "knock[ed] me off at the knees" in the
    manner described in the Ninth Circuit study on gender bias.  (See discussion at p. 7 of this
28   motion, *supra*.)

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE       Page 16**

1     have been 2011.

2
3         THE COURT: And so between 2001 and 2010 you were not in communication with Mr. Hijar?

4         MS. HARPER: No.

5
6
7         THE COURT: And when you resumed your communication with Mr. Hijar, I also understood you to say it was you who told him that there was anger on the part of Mr. Page?

8
9
10
11         MS. HARPER: No. I don't know if I said, "He's angry at me." I think I said that in 2001. But I think that when I contacted him again I asked him if Larry Page had been talking about me, and he said that he had been. I guess they were pretty close friends when they were Postal workers, and they remained in touch.

12         So my understanding is he said, yes, he had been.

13         THE COURT: And he described it as "frequently"?

14
15         MS. HARPER: Yeah. That was my understanding, that it was frequent.

16
17         THE COURT: Now, is this also an e-mail exchange where I can read the words that he used?

18
19         MS. HARPER: Yes. This is an e-mail change [sic].

20
21         THE COURT: In the frequent communication he said that Mr. Page had rage or –

22         (Court reporter interruption.)

23         MS. HARPER: I'm sorry.

24
25
26         I don't believe he used the word "rage." That's my characterization, and it's my perspective, and I think that's where we're getting hung up.

27         THE COURT: No. That's your allegation. I'm not hung up.

28         MS. HARPER: No. I'm saying –

1
2
3

THE COURT: I just want to understand what you meant by "rage," because –  I can understand one citizen being concerned if another citizen is expressing rage, because it could be an indicator that some action could be taken from rage.

4

(Exhibit B, pp. 11-18.)

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

14.    The interrogation by this Court set out in paragraph 13 is indicative of this Court's utter lack of comprehension and/or disbelief as to the mentally unbalanced conduct exhibited by defendant LARRY PAGE that I have characterized as "rage," and which underlies LARRY PAGE's motivation and desire to see that harm come to me, and which rage was communicated to the rapist and stalker RYAN LUGBAUER, which encouraged RYAN LUGBAUER to continue in his tortious and criminal behavior against me. This Court clearly believes that I have "exaggerated" not only my account of LARRY PAGE's behavior and the significance of it, but that I have "exaggerated" or "misrepresented" to this Court – in other words, lied about – the facts. This Court's demand that I produce the "evidence" underlying the allegations in my complaint was a thoroughly unreasonable and grossly unfair demand that I –  with no notice, and not even an opportunity to bring the emails to court with me –  address a motion for summary judgment where no such motion was pending.  It was also an unreasoning and unfounded assault upon my character for truthfulness.  This Court's conduct is a perfect example of the gender bias described in the Ninth Circuit's report.  This Court simply is incapable of comprehending my experience, is unwilling to believe it, and does not believe that significant harm has been done to me by the defendants.  This Court clearly perceives my case as a waste of judicial resources and time, and a species of abuse directed at "innocent" male defendants by a vindictive (crazy) woman.

27
28

15.    This Court further exhibited its inability or unwillingness to comprehend how defamatory talk among a group of angry, vindictive men could result in one of them

1   committing sexual violence against the target of their defamation, or how such talk

2   could reasonably be construed as a tacit agreement – for purposes of a conspiracy

3   allegation – that one of them would sexually assault that woman:

4           THE COURT:   . . . It's one thing for a person to talk about
        another person, even if it's not in the most glamorous of terms. The law
5       does not protect us from being the subject of gossip.

6
            There is no law against that. The law does not protect us from
7       even what would be less than chaste attributes –  men   talking about
        women; men talking about women in relationship to sex. There is no
8       law against that.

9
            The allegations that you make here don't amount to a claim,
10      because it sounds like, if it's true, a group of people sitting around
        talking about someone having sex with you – not them – but someone
11      who is not named in the conversation –

12
            MS. HARPER: I think if they were betting on who is going to do
13      it first –

14
            THE COURT: What's the law against that?   Betting that
15      someone would have an amorous[8] relationship?

16
            MS. HARPER: Not amorous. Sex. There's a difference between
17      love and sex.

18
            THE COURT: All right. I agree with that. But what's wrong with
19      that?

20
            MS. HARPER: I'm surprised that you would think it's okay for
21      a man to sit around and bet about who is going to screw a woman next.

22
            THE COURT: It's not –
23

24          MS. HARPER: You don't see that as an invasion of privacy?

25          THE COURT: I'm not asking why I think. I'm asking what is your
26      authority that that's wrong? What is the law that makes that actionable?

27      _____

28      [8]Amorous means "strongly moved by love and especially sexual love." This case is
    about angry, vindictive men intending rape, not love.

1    MS. HARPER: What makes it –

2    THE COURT: Is it a tort?

3

4    MS. HARPER: Well, a conspiracy could be a tacit agreement.

5    THE COURT: To commit a tort?

6    MS. HARPER: Yes.

7    THE COURT: What is the tort?

8

9    MS. HARPER: The tort is battery.

10   THE COURT: The tort is battery. What's the battery?

11   MS. HARPER: Rape.

12

13   THE COURT: Well, you said "sex." You didn't say "rape."

14   MS. HARPER: If it's not consensual and these men knew that I
     was not someone who is going to sleep around –  it's a combination of
15   the defamatory [sic] that I'm a slut and anybody can have me and –

16
     THE COURT: So they thought you were a person of easy virtue,
17   and that it would not be rape that would be necessary.

18
     MS. HARPER: Right. It's – you know, you can't – a lot of people
19   believe you can't rape a prostitute, and if they are characterizing me as
     something about the quality of a prostitute then they are basically
20   saying, "Go for it." She can't – it's, like, I can't not consent if I'm easy.

21
     THE COURT: Right. In other words, if they thought you were a
22   person of easy virtue and they thought someone would score with you,
23   why would rape be necessary?

24
     MS. HARPER: Because prostitutes can be raped, too, and sluts
25   can be raped.

26
     THE COURT: I understand that's a statement. But I'm asking why
27   –   I'm not asking about prostitutes. I'm talking about these men talking
     about you in terms that says, "You're a person of easy virtue," meaning
28   it would be easy to have sex with you.

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE      Page 20**

1    So why would rape be a part of that?

2    MS. HARPER: Because they riled up Mr. Lugbauer to the point

3    –

4    THE COURT: In other words, it would be, "She's a person who
5    is very chaste. She would never have sex with someone. Now let's see
6    if we can get someone to force her to have sex." That would be a
7    different conversation. Your allegation is they thought you were a
     person who was easy to have sex with.

8    MS. HARPER: May I have permission to file a supplemental
9    brief on this very issue?

10   THE COURT: On what issue?

11   MS. HARPER: On the issue of consent, and if a woman is even
12   capable of consent if she's a loose woman?

13   THE COURT: I don't disagree with that, because all people have
14   bodily integrity and can say, "No." That's not the point.

15   The point is, if they are sitting around saying that they would
16   wish someone to score with you because you are a person of easy
17   virtue, that doesn't necessarily mean someone has to force you. It
     means that force is unnecessary, doesn't it?

18   (Exhibit B, pp. 18-22.)   The above exchange – during which this Court again
19   combatively cross-examined me in a partisan manner  – demonstrates a complete
20   lack of comprehension of the cultural and power dynamics underlying my claims
21   and the rationalization of sexual violence against women.   In scrambling the facts
22   alleged in my complaint, this Court actually isolated (without recognizing it) the
23   justification and the agreement these men reached to send one of their number to
24   commit a sexual assault upon me:   because these men agreed among themselves
25   and *falsely* declared me a "person of easy virtue" – knowing full well that I am not
26   such a person – they agreed, and conveyed to the rapist RYAN LUGBAUER, that
27   my consent to sex was *unnecessary*.   In *falsely* declaring me a "slut" –  a person
28

who will indiscriminately have sex with any man – these defendants agreed that I consented *in advance* to being shoved down on defendant LUGBAUER's sofa, mauled, and then penetrated as I tried to escape his sexual assault on me.   Perhaps this Court, like the defendants and probably the majority of men in this country, does not believe that yanking a woman's pants open and sticking fingers up her vagina is really "forced" sex – it's just "foreplay" or "seduction" – and, at any rate, I was not *physically* injured by this act, so where are my damages?   The fact is that, but for the defamatory talk of the defendants and their betting, RYAN LUGBAUER (a person young enough to be my child) would never have thought of me as a sexual object, and he would never have decided that he did not have to listen when I repeatedly told him I did not want to have sex with him.   In other words, because I have been declared a "slut" by the defendants,  all RYAN LUGBAUER needed to do was act.   My consent was rendered irrelevant.

16.   This Court's unwillingness or inability to recognize the group dynamic involved in the gender violence committed against me is illustrated by the following exchange, in which this Court refused to allow me to articulate that very group dynamic:

> MS. HARPER: It's -- in the context of this case they were so hostile toward me, and – and they wanted – they wanted to put me down. And a great way to put a woman down is to have someone force himself on her sexually.
>
> And maybe it hasn't made it to the legal literature because women are too afraid to sue when they are being attacked that way, because "I'm being called a liar now and I'm being called a crazy person and someone who is exaggerating." [sic as to the quotation marks.]  I'm not exaggerating.
>
> This individual, Mr. Lugbauer –
>
> THE COURT: We are not talking about Mr. Lugbauer.
>
> We're talking about Mr. Page.
>
> MS. HARPER: We're talking about a group of men.

1    THE COURT: Well, we are talking about these two.

2        These are the moving parties –

3

4    MS. HARPER: Right.

5    THE COURT: – and no one else is under consideration.

6        MS. HARPER: And they were hostile. They had no business
7    talking about me. They had no business talking about my body. They
     had no business talking about my sex life.

8

9        THE COURT: Ms. Harper, what you need to be saying is "It was
10   unlawful." They had no legal right –

11       MS. HARPER: Right.   It was an unlawful tacit agreement,
     which makes it a rape.  If they go after me –

12

13       THE COURT: But your language really speaks truly about what
14   you were concerned about here, and that's why I'm going to dismiss
     this, because I agree with you that perhaps it is not – again, to sit
15   around and talk about a woman in terms of her sexuality, that may be
     bad manners, but I don't read in your complaint an allegation of a
16   conspiracy to commit a wrongful act. I understand your concern, and
17   quite frankly, the stronger you advocate for a position that the Court
     should allow this case to go forward based upon gossip and innuendo,
18   the more it affects the Court's view of your case against the other
19   defendants.

20   (Exhibit B, pp. 18-22.)   This case is clearly not based upon "gossip" or "innuendo"

21   – it is based on defamatory statements that obviated the need for RYAN

22   LUGBAUER to obtain my consent for him to engage in sexual acts with me.

23   17.  At this point in the proceedings – having passed judgment on the basis of what

24   became a hearing on an un-noticed Rule 56 motion for summary judgment and

25   Rule 11 motion for sanctions – this Court openly invited the rest of the

26   defendants to file additional motions to dismiss my complaint against them:

27       THE COURT:  . . . *These defendants – if this is – if they are*
     *characteristic, if you believe your case is as strong against others*
28   *as it is against them and this is the character of the kind of claim*

*that you are bringing, the next motion is going to be viewed in that context.*[9]

And so I'm trying to urge you, to the extent someone has committed a physical harm against you and two people have come together to agree that that physical harm would be committed against you, to focus your case there.

This wide-ranging claim of people who talked about you or discussed you is weakening that part of the case. And I'm trying to do this as a neutral person, because whenever the case comes to trial I want you to have the case that you can try based upon a claim that is a violation of the law. I don't find one.

MS. HARPER: I think you have to think in terms of California law of conspiracy, and that it's not as though they have to sit around a table altogether, all at once and say, "You re going to go, and you are going to have sex with her even though she doesn't want to have sex with you."

It's a tacit agreement. It was an environment that was created by these men, and they were hostile people.

And there's no legitimate reason for them to have been saying these things and to be urging each other on.

Now, they may not see it as rape, because it's not like a TV show —

THE COURT: Thank you. I've heard enough. Thank you.

[To the defense attorneys] You didn't use any of your time -- the Court's comments might not have invited further comment, and I can understand that. But I always want to make sure the moving parties have time.

MR. LIEBERMAN: I'm done.

---

[9] In its order dismissing all of my claims against defendants W.B. COYLE and LARRY PAGE, this Court reminded them of its invitation to challenge the statute of limitations for the remaining defamation claims at the summary judgment stage. (Order Granting Defendants' Motions to Dismiss, filed February 9, 2012, p. 2, fn. 4.)

**Case No. CV11-1306 JW - PLAINTIFF'S MOTION TO RECUSE JUDGE WARE      Page 24**

1          THE COURT: Matter submitted?

2          MR. HALLORAN: Yes.

3

4          MR. LIEBERMAN: Yes.

5          THE COURT: Very well. I'm not satisfied, Ms. Harper, that

6 even if I gave you permission to – that you would have more to say here with respect to these defendants, therefore I am going to grant

7 the motion to dismiss without leave to amend.

8          MS. HARPER: Is that to the civil rights causes of action as

9 well?

10          THE COURT: Yes. This is to all claims as to Mr. Coyle and

11 Mr. Page.

12          MS. HARPER: Except for the defamation claims.

13          THE COURT: Well, it's to the motion -- the claims that are

14 subject to this motion, which are the aiding and abetting claim and the

15 conspiracy claim. Thank you.

16 (Exhibit B, pp. 23-25.)

17 **18.**    Following the February 6, 2012, hearing, I consulted with several colleagues who

18 have practiced in the federal courts, some of them for decades.   When I described

19 this Court's conduct during what was purportedly a Rule 12(b) hearing, one

20 individual who handles complex litigation in the federal courts stated that he had

21 "never" seen a plaintiff sworn and compelled to testify on a motion to dismiss.

22 Another colleague stated, "I've never heard of such a thing and I can't suggest

23 anything but an appeal. It sounds very inappropriate . . ."   Others were shocked by

24 this Court's conduct at the hearing and expressed opinions that it was unfair – even

25 outrageous.

26 **19.**    This Court's reaction to my use of the term "Taliban" to describe the conduct of

27 the defendants in this case is instructive as to this Court's personal bias against me.

28 This Court responded – sharply – "I'm hesitant to allow you to characterize these

1   litigants as like the Taliban, because that carries very charged metaphors with it."

2   (Exhibit A, p. 10.)  However, from my point of view – having experienced the abuse

3   described in my complaint – describing this group of men as the American version

4   of the Taliban is appropriate and fair.   The Taliban in Afghanistan is an all-male

5   group that issues rulings regarding public conduct that places severe restrictions

6   on a woman's freedom of movement and creates difficulties for those who do not

7   conform to their rules.   Under Taliban rule, a woman who goes out in public alone

8   is subject to attack.   A woman is not safe unless she is accompanied by a male

9   relative.   The Taliban constantly monitors the behavior of Afghan women.   In this

10   country –  although the style of oppression is different – men do much the same

11   thing.   I was quietly living my life – alone, working hard, and keeping to myself

12   most of the time.   Then defendant RYAN LUGBAUER – whom I never "dated" and

13   in whom I never expressed any sexual interest –   sexually assaulted me, claimed

14   "ownership" of me and offered me to at least one other man for sex, and when I

15   protested he engaged (and continues to engage) in controlling, threatening, and

16   destructive behavior.   When I continued to resist, I eventually learned that for years

17   – completely unknown to me – the other male defendants had as a group been

18   monitoring my behavior, defaming me, and setting me up for the violence inflicted

19   upon me by RYAN LUGBAUER – all based upon their rigid beliefs about how

20   women should behave and their corrupt and unfounded notions of superiority and

21   authority over women.   I see other women staying in miserable marriages in order

22   to obtain protection so as to avoid the sort of violence I have experienced.   Some

23   of those women are abused by their husbands.   A large number of men in this

24   culture believe in their right to control and use women, the defendants in this case

25   among them.   This Court, for whatever reason, seems to be in completely in denial

26   of this reality.   This Court appears very angry at me for bringing this lawsuit into

27   his courtroom.    I can only conclude – especially given what happened during the

28   February 6, 2012 hearing – that this Court harbors a profound personal bias against

1    me, based on my gender.

2  **20.**    In summary, this Court's conduct throughout the proceedings –  and especially
3          during the February 6, 2012, hearing – suggests bias against me for several
4          reasons.

5      ●    First, despite the great weight of authority in California protecting the
6          privacy of rape victims, this Court has compelled me to choose between
7          identifying myself by name as the plaintiff or abandoning this case
8          altogether.  The reason given by this Court for that decision was  that I was
9          "making charges against these defendants, not someone else, and so it's
10         because of the nature of the litigation" – in other words, apparently because
11         this Court finds my claims against the defendants offensive, does not
12         believe the truth of my allegations, and wishes to protect the men who have
13         inflicted wrongs against me, I must suffer having intimate, false "facts"
14         about my life and my purported sexuality displayed to the public, and I must
15         suffer being publicly and falsely accused of lying.

16     ●    Second, this Court has declined to control or even address the sexist and
17         abusive behavior of counsel – particularly defendant LARRY PAGE's
18         attorney, Mr. Leiberman – and has permitted all counsel to laugh at me in
19         open court.

20     ●    Third, this Court has engaged in conduct that is far outside the bounds of
21         ordinary procedure – so much so that several of my colleagues have
22         characterized this Court's behavior as "unheard of" and have stated that they
23         have "never" seen a judge do such things.

24     ●    Fourth, this Court has repeatedly belittled and insulted me in open court,
25         stopping just short of calling me crazy ("rambling") and a liar ("If you are
26         misrepresenting...."; "If you are exaggerating. . .").

27     ●    Fifth, this Court has  threatened me in open court during a Rule 12(b)
28         hearing – which should have been about allegations on the face of the

pleadings, not evidence – with dismissal of my entire case, placed me under oath and compelled me to testify, and subjected me to veiled threats that my livelihood as an attorney may be in jeopardy should this court find that I have "misrepresented" or "exaggerated" the facts I have been compelled to testify to in court.

- Sixth, during the hearing on what was supposed to be a rule 12(b) motion, this Court threatened to compel me to produce emails between myself and one of my witnesses, and threatened to contact that witness to "verify" the truth as to what I was compelled to state about that witness under oath. Neither I nor any other attorney I know of has ever heard of such conduct by a federal judge.   These extraordinary and unauthorized requirements imposed upon me are indicative of this Court's animus against me.

- Seventh, following a year of piecemeal motions to dismiss my complaints, one of which was – without notice to me – abruptly and *sua sponte* transformed into a motion for summary judgment and Rule 11 motion – this Court has expressly invited the defendants to make more motions to dismiss and reminded them to make motions for summary judgment.   This conduct suggests pervasive bias and personal animus against me, particularly given this Court's extraordinary measures taken to compel my testimony during a proceeding where such testimony was inappropriate, and the threats made against me by this Court should my compelled testimony not meet this Court's standards for not "exaggerating" or "misrepresenting" facts.

21.   In conclusion, this Court, in treating me as someone whose words or actions are not even worthy of consideration, and in openly encouraging the defendants to see themselves as "wronged" by my having brought this lawsuit when the case is still at the pleading stage and no discovery has been done and no evidence has been presented, has dehumanized me.   This

dehumanization exacerbates the denial of dignity and autonomy which is so much a part of the injury of rape, and, in effect, subjects me to the same harm as was inflicted upon me by the individual defendants who set me up to be raped, stalked and harassed; the rapist; and the individual police defendants who joined in the mob that has encouraged, supported and assisted my rapist and stalker and denied me access to police services and the courts.  This Court, based on personal bias against me as a woman who is a rape victim, has spontaneously perverted the federal rules of civil procedure and created new "rules" to govern me in preventing fair presentation of my case to an impartial court of law.

22.     I hereby certify that my allegation of pervasive bias, personal animus and prejudgment on this Court's part is made in good faith based on all the facts and circumstances known to me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 26th day of February, 2012, in San Francisco, California.

_____//_____//_____
GAIL HARPER